TWIN FALLS SALMON RIVER LAND & WATER CO. et al. v. CALDWELL
et al.*

(Circuit Court of Appeals, Ninth Circuit.   May 7, 1917.)

No. 2725.

1. WATERS AND WATER COURSES �köm222—IRRIGATION RIGHTS—CAREY ACT.

All persons using or contracting for the use of water for irrigation purposes in Idaho do so with reference to the general irrigation law of the state, contained in Rev. Codes Idaho, § 3252 et seq., which provides that no user shall be entitled to the use of more water than can be beneficially applied to the land for the benefit of which the appropriation is made, and if the land is within an irrigation project created under the Carey Act (Act Aug. 18, 1894, c. 301, § 4, 28 Stat. 422, as amended by Act June 11, 1896, c. 420, § 1, 29 Stat. 413 [Comp. St. 1916, §§ 4685, 4686]), also with reference to the provisions of such act and of the state law and contracts for carrying it into effect which give a lien upon the land for any balance due on the water right to take precedence of all other liens or rights.

2. WATERS AND WATER COURSES ⊝⊃222—IRRIGATION RIGHTS—CAREY ACT "DETERMINED."

A contract between the state and a company, which undertook to construct an irrigation system under the Carey Act, recited that the company had acquired a water right for the irrigation of certain public lands within the terms of the act, "together with other lands susceptible of irrigation from said system, which water right is hereby dedicated for use upon said lands." The company was required to organize an operating company which should sell shares or water rights to settlers on the lands which should entitle each to a proportionate interest in the operating company and its property, rights, and franchises; "it being understood, however, that priority of application or priority of entry or settlement shall not give any priority of right to the use of water, * * * but shall entitle the purchaser to a proportionate interest only therein." It further provided that the company should construct a reservoir of a stated capacity, "which amount in addition to the normal flow of said stream during the irrigation period has been determined to be sufficient to furnish two and three-fourths acre feet of water per acre for each acre of land to be irrigated, and the second party promises and agrees to build and construct the canal and lateral system of sufficient capacity to deliver water to the users thereof at the rate of one-hundredth of a second foot per acre for each acre of land to be irrigated." The company issued bonds to procure money for the work secured by assignment of the contracts with settlers and the liens given by the statute. When the system was completed and in operation, it was found that the water supply was sufficient to irrigate only about one-third of the quantity of land included in the project and insufficient to properly irrigate the land for which contracts had been sold. *Held*: (1) that the settlers held their contracts and land subject to the liens in favor of the mortgagee given by the statute; (2) that they were entitled under their contracts to one-hundredth of a second foot of water per acre provided such quantity could be beneficially applied, but were not entitled to 2¾ acre feet, the word "determined" in the contract between the state and the company being used in the sense of estimated only; (3) that the first purchasers of contracts were entitled to no preference over later purchasers, but that they were entitled to an injunction restraining the company from executing further contracts.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Determine.]

3. WATERS AND WATER COURSES ⊕⇒222—RECLAMATION OF ARID LAND—GRANT TO STATE—CAREY ACT.

The action of the Land Department in approving an irrigation plan adopted by a state under the Carey Act, and segregating the lands embraced therein, is not a conclusive determination that the state is entitled to the land, but whether or not the state has "actually furnished" an ample supply of water for the reclamation of any particular tract of such land to entitle it to a patent under Act June 11, 1896, c. 420, § 1, 29 Stat. 413 (Comp. St. 1916, § 4686), is a question of fact to be determined by the department.

Appeal from the District Court of the United States for the Southern Division of the District of Idaho; Frank S. Dietrich, Judge.

Suit by A. E. Caldwell, W. F. Mikesell, V. E. Morgan, J. E. Pohlman, W. C. Pond, James W. Beauchamp, Carl Washburn, and Harold S. Simms, in their own behalf and in behalf of all persons similarly situated with them, against the Twin Falls Salmon River Land & Water Company, Salmon River Canal Company, Limited, Commonwealth Trust Company of Pittsburgh, trustee, and A. C. Robinson. Decree for complainants (231 Fed. 769), and defendants appeal. Reversed in part.

This case grows out of the establishment and construction of an irrigation system known as the Salmon River Project under and in pursuance of an act of Congress approved August 18, 1894 (28 St. Lg. 372, 422), and amendments thereto, known as the Carey Act, and of certain legislation of the state of Idaho.

The purpose of the act of Congress is therein expressly declared to be to aid the public land states in the reclamation of the desert lands situate therein, and in the settlement, cultivation, and sale thereof in small tracts to actual settlers. To carry into effect that object, the act provides that the Secretary of the Interior, with the approval of the President, is authorized upon proper application of such public land states to enter into a contract with each of them in which there may be such desert lands as are described by Congress in certain designated previous acts, binding the United States to donate, grant, and patent to the state, free of cost of survey or price, such desert lands, not exceeding 1,000,000 acres, as the state would cause to be irrigated, reclaimed, occupied, and not less than 20 acres of each 160-acre tract cultivated by actual settlers, within 10 years next after the passage of the act, as thoroughly as required of citizens who may enter under a certain preceding act of Congress approved March 3, 1877, and the act amendatory thereof approved March 3, 1891; provided, however, that before the application of any such state is allowed, or any contract is executed, or any segregation of any of the desert lands from the public domain is ordered by the Secretary of the Interior, such state shall file a map of the land proposed to be irrigated, together with a plan showing the mode of the contemplated irrigation, which plan shall be sufficient to thoroughly irrigate and reclaim said desert land and prepare it to raise ordinary agricultural crops, and shall also show the source of the water to be used for its irrigation and reclamation, the Secretary of the Interior being by the act empowered to make necessary regulations for the reservation of the land applied for by the state, to date from the date of the filing of the map and plan of irrigation, such reservation, however, to be of no force in the event such map and plan of irrigation be not approved as required by the act. The act further empowers any state, entering into a contract with the United States through the Secretary of the Interior, to make all necessary contracts to cause the said desert lands to be reclaimed, and to induce their settlement and cultivation in accordance with and subject to the provisions of the act of Congress; the state, however, being prohibited from leasing any of such lands or using or disposing of them in any way except to secure their reclamation, cultivation, and settlement. And the act of

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Congress further provides that, as fast as any such public land state shall furnish satisfactory proof, according to such rules and regulations as may be prescribed by the Secretary of the Interior, that any of said desert lands are cultivated, reclaimed, and irrigated by actual settlers, patents shall be issued to the state or its assigns therefor, provided that the said public land states shall not sell or dispose of more than 160 acres of such desert lands to any one person, and that any surplus of money derived by any such state from the sale of such lands in excess of the cost of their reclamation shall be held as a trust fund and be applied to the reclamation of other desert lands in such state.

By an act approved June 11, 1896 (29 St. Lg. 413, 434), Congress further provided that under any law theretofore or thereafter enacted by any state, providing for the reclamation of arid lands in pursuance and acceptance of the terms of the grant made by the above-mentioned act of August 18, 1894, "a lien or liens is hereby authorized to be created by the state to which such lands are granted and by no other authority whatever, and when created shall be valid on and against the separate legal subdivisions of land reclaimed, for the actual cost and necessary expenses of reclamation and reasonable interest thereon from the date of reclamation until disposed of to actual settlers; and when an ample supply of water is actually furnished in a substantial ditch or canal, or by artesian wells or reservoirs, to reclaim a particular tract or tracts of such lands, then patents shall issue for the same to such state without regard to settlement or cultivation: Provided, that in no event, in no contingency, and under no circumstances shall the United States be in any manner directly or indirectly liable for any amount of any such lien or liability, in whole or in part."

By section 1613 et seq. of the Revised Codes of Idaho, that state accepted the grant so made by Congress, subject to all of its terms and conditions, and provided that the selection, management, and disposal of such desert lands situated in Idaho should be vested in its state board of land commissioners, and further provided that any person, company of persons, association, or incorporated company, constructing, having constructed, or desiring to construct ditches, canals, or other irrigation works to reclaim lands under the provisions of the Idaho statute, should file with the board of land commissioners a request for the selection on behalf of the state by the board of the land to be reclaimed, designating it by local subdivisions, which request should be accompanied by a proposal to construct the ditch, canal, or other irrigation works necessary for the complete reclamation of the land asked to be selected, and which proposal should be prepared in accordance with the rules of the board and in accordance with the regulations of the Department of the Interior, and should be accompanied by the certificate of the state engineer of Idaho that application for permit to appropriate water has been filed in his office, together with the state engineer's report thereon, and shall state the source of water supply, the location and dimensions of the proposed works, the estimated cost thereof, the price and terms per acre at which perpetual water rights will be sold to settlers on the land to be reclaimed; such perpetual rights to embrace a proportionate interest in the canal or other irrigation works, together with all the rights and franchises attached thereto.

Upon the presentation to the state engineer of such proposals, in the prescribed form and setting forth the prescribed facts, that officer is by the state statute required to examine the same and make a written report to the board of land commissioners "stating whether or not the proposed works are feasible; whether the proposed diversion of the public waters of the state will prove beneficial to the public interest; whether there is sufficient unappropriated water in the source of supply; and whether or not a permit to divert and appropriate water through the proposed works has been approved by him; whether the capacity of the proposed works is adequate to reclaim the land described; whether or not the proposed cost of construction is reasonable, and whether or not the maps filed in his office comply with the requirements of said office and the regulations of the Department of the Interior; also whether or not the lands proposed to be irrigated are desert in

character and such as may properly be set apart under the provisions of the aforesaid act of Congress and the rules and regulations of the Department of the Interior thereunder"—with a provision for further and personal examination by himself or through a qualified assistant in the event such further examination be necessary to enable him to report intelligently thereon to the board, his disapproval ending the proceeding. In the event of a favorable report by the engineer and the approval thereof by the board of land commissioners, the register of the board is required to file in the local United States Land Office a request for the withdrawal of the land described in the proposal, and upon the withdrawal of such land by the Department of the Interior the board of land commissioners is by the state statute required to enter into a contract with the parties submitting the proposal, which contract shall contain "complete specifications of the location, dimensions, character, and estimated cost of the proposed ditch, canal, or other irrigation works; the price and terms per acre at which such works and perpetual water rights shall be sold to settlers; and the price and terms upon which the state is to dispose of the lands to settlers."

Passing provisions of the state statute not here important to be noticed, it further provides that any citizen of the United States or any person having declared his intention to become a citizen (excepting married women), over the age of 21 years, may make application under oath to the board of land commissioners to enter any of the desert lands in an amount not to exceed 160 acres for any one person, which application shall state that the person desiring to make such entry does so for the purpose of actual reclamation, cultivation, and settlement, in accordance with the act of Congress and the laws of Idaho relating thereto, and that the applicant has never received the benefit of the provisions of the laws of the state to an amount greater than 160 acres including the number of acres specified in the application, and which application shall be accompanied by a certified copy of a contract for a perpetual water right entered into with the person, company, or association authorized by the board of land commissioners to furnish water for the reclamation of such lands, with other requirements not necessary to mention. Upon the filing of such application, together with a partial payment of 25 cents an acre, the board is required to issue a certificate of location of the land to the applicant, such certificate to be recorded when issued in a book to be kept for the purpose; all such lands to be disposed of by the board at a uniform price of 50 cents an acre, half to be paid at the time of entry, and the remainder at the time of making final proof by the settler.

Further provisions of the state act provide for the disposition of the proceeds of sale, and section 1628 is as follows:

"Within one year after any person, company of persons, association or incorporated company, authorized to construct irrigation works under the provisions of this chapter, shall have notified the settlers under such works that they are prepared to furnish water under the terms of their contract with the state, the said settler shall cultivate and reclaim not less than one-sixteenth part of the land filed upon, and within two years after the said notice the settler shall have actually irrigated and cultivated not less than one-eighth of the land filed upon, and within three years from the date of said notice the settler shall appear before the register of the state board of land commissioners, a judge or clerk of any court of record within the state, or commissioners to be designated by the board, within the state, and make final proof of reclamation, settlement, and occupation, which proof shall embrace evidence that he is the owner of shares in the works which entitle him to a water right for his entire tract of land sufficient in volume for the complete irrigation and reclamation thereof; that he has been an actual settler thereon and has cultivated and irrigated not less than one-eighth part of said tract; and such further proof, if any, as may be required by the regulations of the Department of the Interior and the board. The officer taking this proof shall be entitled to receive a fee of two dollars, which fee shall be paid by the settler and shall be in addition to the price paid to the state for the land: Provided, that when the register of the board takes final proof, all fees received by him shall be turned into the state treasury. The

commissioners appointed by the board are hereby authorized to administer oaths. All proofs so received shall be submitted by the register to the board, and shall be accompanied by the final payment for said land, and upon approval of the same by the board the settler shall be entitled to his patent. If the land shall not be embraced in any patent theretofore issued to the state by the United States, the proofs shall be forwarded to the Secretary of the Interior, with the request that a patent to said lands be issued to the state. When the works designed for the irrigation of lands under the provisions of this chapter shall be so far completed as to actually furnish an ample supply of water in a substantial ditch or canal to reclaim any particular tract or tracts of such lands, the state of Idaho shall, through the state board of land commissioners, make proof of such fact, and shall apply for a patent to such lands in the manner provided in the regulations of the Department of the Interior."

The next section (1629) provides that, upon the issuance of a patent to any lands by the United States to the state, notice shall be forwarded to the settler upon such land, whereupon it shall be the duty of the board of land commissioners, under the signature of its president, attested by its register, to issue a patent to said land from the state to the settler, and the state statute further provides that the water rights acquired under the state law shall attach to and become appurtenant to the said desert lands as soon as title thereto passes from the United States to the state, and that any person, company, or association furnishing water for such land shall have a first and prior lien on such water right and the land upon which the said water is used for all deferred payments for the said water right, such lien to be in all respects prior to any and all other liens created or attempted to be created by the owner and possessor of the said land, and to remain in full force and effect until the last deferred payment for the water right is paid according to the terms of the contract under which such water right is acquired, and that the contract for the water right upon which the said lien is founded shall be recorded in the office of the recorder of the county in which the land is situated.

The state statute further provides that, upon default of any of the deferred payments secured by any such lien, the person, company of persons, association, or incorporated company holding or owning the said lien, may foreclose the same according to the terms and conditions of the contract granting and selling to the settler the water right, with certain provisions respecting the manner of making the sale, and that at such sale no person, company of persons, association, or incorporated company owning and holding such liens shall bid in or purchase any land or water right at a greater price than the amount due on such deferred payment for such water right and land, and the cost incurred in making the sale of the land and water right, with certain provisions with respect to the redemption of such land and water rights not important to be stated.

The plaintiffs in the case (appellees here), who brought the suit not only for themselves but in behalf of all others similarly situated, are settlers upon their respective tracts embraced by the laws referred to, and hold contracts for water for the irrigation thereof issued by the appellant Twin Falls Salmon River Land & Water Company, the corporation which, pursuant to the Idaho statutes, contracted with that state for the construction of the system and subsequently with the plaintiffs and other settlers. It also issued bonds, to secure the payment of which it assigned as collateral the settlers' contracts to the appellant Robinson, and executed a trust deed on all of its interest in the system to the appellant Commonwealth Trust Company of Pittsburgh, as trustee—all for moneys advanced with which to construct the works.

The appellant Salmon River Canal Company, Limited, is a corporation organized by the construction company with the consent of the state board of land commissioners for the purpose of operating the system and ultimately taking title to it for the same purpose.

The state entered into the contract with the construction company April 30, 1908, and the opening for entry of the lands to holders of water right

agreements was advertised for June 1st of the same year, and contracts covering an aggregate of about 73,000 acres were entered into with the settlers, including the complainants, prior to the bringing of the present suit.

The gist of the bill, as said by the court below, is not that the construction work was improperly done, but that this acreage is greatly in excess of the capacity of the water appropriated for the purpose of supplying its needs, even during ordinary seasons; that the construction company has sold water rights far in excess of the supply, that being, according to the bill and the contention of the appellees, sufficient for about 30,000 acres only, the purchasers of which, including the complainants, should, as alleged and here contended, be preferred and all subsequent purchasers eliminated and their contracts for water canceled.

That there is no other source of supply is undisputed.

The complainants having refused to pay the installments due from them under their respective purchases, on the ground, as alleged, that the construction company has failed to comply with the terms of its contract, and the trustee and the collateral holder having brought suits of foreclosure to enforce such payments, the purpose of this suit, as prayed in its bill, is to obtain a decree adjudging, among other things, that the amounts due from the settlers and contract holders of water rights in the system constitute a trust fund for the purpose of carrying out the objects of the contracts and the furnishing of all of the land, having water rights appurtenant to it under the system, with ample and sufficient water "not less than one-half miner's inch per acre continuous flow, or 2¾ acre feet per acre if delivered by periods, upon demand of the several owners thereof measured and delivered not more than one-half mile from each quarter section of land on the said irrigation system, and that the trust so declared and created be prior and superior to the rights or claims of any and all persons"; that the lien claimed by the defendant trustee be adjudged subordinate to the rights of the complainants and other water contract holders in the system; that the trustee and all holding under it be enjoined from collecting any money due from the contract holders; that the defendant Robinson be enjoined from collecting any money upon the water contracts assigned to him by the construction company; that such assignments be adjudged void; and that a receiver be appointed by the court with certain specified powers, etc.

The defendants to the bill put in issue, among other things, its chief allegations to the effect that the contract between the construction company and the respective complainants was for a specific amount of water for their respective tracts, at one place in the bill alleged to be "one one-hundredth of one cubic foot of water per acre per second of time for each share or water right sold," with a proportionate interest in the canal, reservoir, and other irrigation works; that the complainants could not successfully reclaim their lands and produce crops with less than 2¾ acre feet per acre during each irrigating season; and that in no case, according to the contract, "should water rights or shares be dedicated to any lands in said segregation or sold beyond the carrying capacity of the canal, or in excess of the appropriation of water therefor."

The court below declined to admit evidence offered by the defendants for the purpose of showing that the complainants and those in behalf of whom they also sued did not need and could not use the amount of water demanded by them, holding that to be a question the defendants could not raise, to which ruling an exception was reserved, and the ruling is here assigned as error.

The trial resulted in the following decree, from which the present appeal was taken:

"It is ordered, adjudged, and decreed: That the defendant Twin Falls Salmon River Land & Water Company contracted with the state of Idaho and with the settlers holding agreements for the purchase and sale of water rights that it, the said defendant, would provide a system of canals and reservoirs on what is known as the Salmon River Project, in Twin Falls county, state of Idaho, which in ordinary seasons would furnish a supply of water for irrigation purposes sufficient for the acreage covered by such settlers'

agreements at the rate of 2¾ acre feet per acre, measured at the points of delivery from the system into the consumers' laterals; and further that it would not sell rights in excess of such available supply. That the said defendant be restrained from making additional contracts for the sale of water rights and also from waiving the right to forfeit any existing contract. That the said defendant and the Commonwealth Trust Company of Pittsburgh, a corporation, trustee, and A. C. Robinson be, and each of them is, hereby enjoined and restrained from collecting or attempting to collect, or from enforcing payments upon said water right agreements, including any overdue payments or installments on said agreements, until such time as the holders thereof have been provided with the water supply so contracted for, or are given trustworthy assurance, to be approved by the court, that said water will be provided, or until the further order of this court.

"It is further ordered and decreed that jurisdiction be retained for the purpose of making final disposition of the cause, and leave is hereby granted to either party to make application at any time for the introduction of further proof touching the available water supply, and more particularly relating to: (1) The amount and dignity of the rights awarded to adverse claimants in the suit of Twin Falls Salmon River Land & Water Company et al. v. Vineyard Land & Stock Co., now pending in this court, and numbered 405; (2) seepage in the reservoir basin and the canal system; and (3) the aggregate amount of water agreements actually outstanding at the time of such application, and upon the submission of such proof for the entry of final decree.

"Dated this 29th day of November, 1915.    Frank S. Dietrich, Judge."

Samuel H. Hays, of Boise, Idaho, for appellant Twin Falls Salmon River Land & Water Co.

J. H. Richards, O. O. Haga, and McKeen F. Morrow, all of Boise, Idaho, for appellants Commonwealth Trust Co. and Robinson.

Pasco B. Carter, of Boise, Idaho, for appellant Salmon River Canal Co.

C. O. Longley and E. A. Walters, both of Twin Falls, Idaho, for appellees.

Albert N. Edwards, of St. Louis, Mo., amicus curiæ.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). [1] In the consideration of the case it is to be remembered that the United States owned the land, and the state of Idaho the water. The object and the terms and conditions of the grant concerning which the Secretary of the Interior was authorized to contract with the state have been set out in full in the foregoing statement. Among the requirements is an application on the part of the state for such of the lands authorized to be granted as it would agree to cause to be irrigated, reclaimed, occupied, and cultivated as specified, preceding such application with a map of the land proposed to be irrigated and a plan showing the mode of the proposed irrigation sufficient to thoroughly irrigate and reclaim it and to prepare it to raise ordinary agricultural crops. The act of Congress also authorized the state entering into such contract with the United States through the Secretary of the Interior to itself make all necessary contracts for the reclamation of such lands and to induce their settlement and cultivation in accordance with and subject to the provisions of the congressional act, which further provided that as fast as any such state should furnish satisfactory proof according to the rules and regulations prescribed by the Secretary of

the Interior of the reclamation, irrigation, and cultivation by actual settlers of any of such lands, patent should be issued to the state or its assigns therefor, provided the state should not sell or dispose of more than 160 acres to any one person, and that any surplus money derived by the state from such sale in excess of the cost of reclamation be held as a trust fund and applied to the reclamation of other desert land in the state. By the act of June 11, 1896 (29 St. Lg. 413), patents were authorized to be issued to the states for any of the lands so granted, without regard to settlement or cultivation, when an ample supply of water is furnished therefor.

It is therefore obvious that the act of Congress which lies at the foundation of the case authorized the making of a contract by the United States, through the Secretary of the Interior, with any state in which are situated the specified desert lands, and the making of contracts by such states for their reclamation and irrigation; and such contracts were made in the instant case.

[2] It is also apparent from the language of the act of August 18, 1894, that the grant to the public land states containing the specified desert lands was not a grant in præsenti, but, on the contrary, such states were made the agency through which the lands might be reclaimed, and the terms and conditions were therein prescribed by Congress, on the performance of which the title of the United States thereto should pass by patent of the government; Congress by its subsequent act of June 11, 1896 (29 St. Lg. 413, 434), having also authorized a lien or liens to be created by the state under any law theretofore or thereafter enacted, which liens should be "valid on and against the separate legal subdivisions of land reclaimed, for the actual cost and necessary expenses of reclamation and reasonable interest thereon from the date of reclamation until disposed of to actual settlers," and further providing that:

"When an ample supply of water is actually furnished in a substantial ditch or canal, or by artesian wells or reservoirs, to reclaim a particular tract or tracts of such lands, then patents shall issue for the same to such state without regard to settlement or cultivation."

Section 1629 of the Revised Codes of Idaho provides, among other things:

"Upon the issuance of a patent to any lands by the United States to this state, notice shall be forwarded to the settler upon such land. It shall be the duty of the board, under the signature of the president attested by its register, to issue a patent to said lands from the state to the settler. The water rights to all lands acquired under the provisions of this chapter shall attach to and become appurtenant to the land as soon as title passes from the United States to the state. Any person, company or association, furnishing water for any tract of land, shall have a first and prior lien on said water right and land upon which said water is used, for all deferred payments for said water right; said lien to be in all respects prior to any and all other liens created or attempted to be created by the owner and possessor of said land; said lien to remain in full force and effect until the last deferred payment for the water right is fully paid and satisfied according to the terms of the contract under which said water right was acquired."

At all the times in question the right to appropriate and divert the unappropriated water of any natural stream of the state to benefi-

cial uses was expressly given by the Constitution of Idaho (section 3, art. 15, Const.), and section 3252 et seq. of its Revised Codes, contain, among other things, provisions for the appropriation of such waters, and, among them provisions to the effect that such appropriations can be made only for some beneficial purpose and shall be initiated by an application to the state engineer for a permit to make the appropriation, culminating in a license issued by that officer to the appropriator, with a provision to the effect that no such license shall be issued confirming the right to the use of more than one second foot of water for each 50 acres of land irrigated, unless it be shown to the satisfaction of the engineer or a court that a greater amount is necessary, and to the effect that no user under such appropriation shall be entitled to the use of more water than can be beneficially applied on the land for the benefit of which the right is given.

That the laws of the state applicable to the appropriation and use of the nonnavigable waters of the state are controlling is, of course, clear; and that all parties contracting with respect to such waters and desert lands do so with at least the presumed knowledge of both the federal and state laws is also plain.

The record shows that, under those laws, the purpose and particulars of which, so far as pertinent, are set forth in the statement of the case already made, certain named individuals, under permit of the state engineer, undertook to appropriate of the waters of Salmon river 1,500 cubic feet per second for the purpose of reclaiming and irrigating, under the legislation of Congress and of the state, 150,000 acres of desert lands, including not only desert lands of the United States embraced by the grant, but also certain school sections of desert land belonging to the state; their proposal and request to that end, dated August 12, 1907, being approved by the state board of land commissioners on the same day.

It appears further that all of the property, rights, and franchises acquired by those individuals under their appropriation and the said accepted proposal and request subsequently passed, with the consent of the state board of land commissioners, to the Twin Falls Salmon River Land & Water Company, with which company that board, on behalf of the state of Idaho, on the 30th day of April, 1908, entered into a written contract pursuant to the act of Congress and the provisions of the state statute, which contract provided, among other things, in paragraph I, that the company would construct the irrigation works described in the proposal and request of August 12, 1907, and would sell shares or water rights in the system from time to time as provided in the contract, to the person or persons filing upon the government land embraced by the grant by Congress, and also to the owners of other lands susceptible of irrigation from the system or from any extension or enlargement thereof, such shares or water rights to be sold on the terms subsequently specified in the contract, and would also transfer the ownership, management, and control of the system to the purchasers of shares or water rights, in the manner also subsequently provided for in the contract.

After describing, in paragraphs II and III, the reservoir, dam, ditches, canals, laterals, and rights of way pertaining to and being parts of

the irrigation system so agreed to be constructed by the company, paragraph IV reads:

"The party of the second part (the construction company) is the owner of that certain water right evidenced by permit No. 2659 for 1,500 cubic feet per second of the waters of Salmon river in Twin Falls county, state of Idaho, issued by the state engineer of the state of Idaho, to be used for the irrigation of the lands described in Exhibit A herewith, together with other lands susceptible of irrigation from said system, which water right is hereby dedicated for use upon said lands, and it is agreed and understood that the dam hereinbefore mentioned shall be constructed so as to provide a reservoir for the impounding of 180,000 acre feet of water, which amount, in addition to the normal flow of the said stream during the irrigation period, has been determined to be sufficient to furnish two and three-fourths acre feet of water per acre for each acre of land to be irrigated. And the second party promises and agrees to build and construct the canal and lateral system of sufficient capacity to deliver water to the users thereof at the rate of one-hundredth of a second foot per acre for each acre of land to be irrigated."

Paragraph V provides, in substance, that upon the execution of the contract, and when the actual construction of the canal is inaugurated, the state will, after notice given in conformity with law, throw open the lands covered by the grant, or a specified portion thereof, for settlement under regulations prescribed by its board of land commissioners; and by paragraph VI the state agreed not to approve any application for such lands until the person or persons applying therefor should furnish to the board of land commissioners a copy of the contract entered into by such person or persons with the construction company for the purchase of sufficient shares or water rights in the system for the irrigation of the lands applied for, such shares or water rights to be evidenced by stock in the Salmon River Canal Company, Limited, which the contract provides the construction company should cause to be organized; and by paragraph VI the construction company further agreed as follows:

"That to the extent of the capacity of the irrigation works and to the extent of the water rights to which it is entitled as rapidly as the lands are open for entry and settlement, it will sell or contract to sell water rights or shares for land to be filed upon (to) the qualified entrymen or purchasers without preference or partiality other than that based upon priority of application, it being understood, however, that priority of application or priority of entry or settlement shall not give any priority of right to the use of water flowing through the canal against subsequent purchasers but shall entitle the purchaser to a proportionate interest only therein, the water rights having been taken for the benefit of the entire tract of land to be irrigated from the system. The priority of application upon the opening days shall be determined by a system to be devised under the direction of the state board of land commissioners."

By paragraph VII the state agreed to sell the lands covered by the government grant to it to such persons as might be entitled to file upon the same, for the sum of 50 cents an acre, half of which should be paid at the time of the application for entry thereof made to the board of land commissioners, and the remaining half at the time of the making of final proof thereon.

By paragraph VIII, the construction company agreed that:

It would sell or cause to be sold to the person or persons filing upon any of the government lands embraced by the grant, or to the owners of any other

lands susceptible of irrigation from the system, by good and sufficient contract of sale with right of possession and enjoyment by the purchaser pending its fulfillment, "a water right or share in said canal for each and every acre filed upon or purchased from the state or acquired from the United States. Each of said shares or water rights shall represent a carrying capacity in said canal sufficient to deliver water at the rate of one-hundredth ($1/100$) of one (1) cubic foot of water per acre per second of time and each share or water right sold or contracted to be sold as herein provided shall also represent a proportionate interest in said canal and irrigation works together with all rights and franchises therein based upon the number of shares finally sold in said canal; said irrigation system, however, is to be built in accordance with the plans heretofore filed with the board, which system, according to said plans, has been determined by the state engineer to have the carrying capacity hereinbefore mentioned. Such water rights or shares shall be sold to the person or persons aforesaid for the lands hereinafter described or for lands which are susceptible of irrigation from said system as follows:

"To the person or persons filing upon any of said lands at a price not exceeding forty dollars ($40) per share to be paid for as follows:

"One-fifth ($1/5$) in cash at the time of sale and the remainder in five equal annual installments bearing interest at the rate of six per cent. (6%) per annum payable annually. To the person or persons purchasing any portion of sections No. 16 or 36, which are susceptible of irrigation and reclamation from this canal at a price not to exceed thirty dollars ($30) per share provided said water rights are purchased within one year after the purchase of the lands from the state and not exceeding forty dollars ($40) per share at any time thereafter; said payments upon said state lands to be made one-seventh ($1/7$) at the time of purchase and the remainder in six (6) equal annual installments with interest thereon at the rate of six per cent. (6%) per annum payable annually. In case the purchaser or entryman on desert lands, homestead lands or any lands other than those segregated under the Carey Act declines to purchase water rights within one year after the Carey Act lands are thrown open for settlement, the sum of two dollars and forty cents ($2.40) may be added to the price of water rights for each year's delay or fraction thereof. No charge shall be made for water rights for lands taken by the right of way for any railroad filing its plat with the state board of land commissioners prior to June 1, 1908, and all entries of land shall be made subject to such right of way.

"This agreement shall not be construed to prevent the sale of shares or water rights on terms more favorable than those herein provided or to prevent the payment of installments on the purchase price in advance of maturity of the same at the option of the purchaser but in no case shall water rights or shares be dedicated to any lands before mentioned or sold beyond the carrying capacity of the canal or in excess of the appropriation of water therefor."

Paragraph IX of the contract between the state and the construction company, after reciting the necessity of providing a convenient method for transferring the ownership and control of the system from the company to the purchasers of water rights and for the purpose of determining their rights among themselves and between them and that company, and for the purpose of operating and maintaining the system, provided that, as soon as the granted lands should be thrown open for settlement, the construction company would cause a corporation, to be known as the Salmon River Canal Company, Limited, to be organized, with articles of incorporation substantially as annexed to the contract, with an authorized capital stock of 150,000 shares, intended to represent one share for each acre of land which might be thereafter irrigated from the system; the entire capital stock to be delivered to the construction company to enable it "to deliver to purchasers of water rights the shares of stock representing the same," and one share

to be delivered for each acre of land entered or filed upon, with other provisions not necessary to be noticed. Paragraph IX of the contract also contains the further provision that, whenever it is certified by the chief engineer of the company and the state engineer that certain portions of the canal are completed for the purpose of operation, the same may, with the consent of the state land board, be turned over to the canal company for operation; such transfer and operation, however, not in any manner to lessen the responsibility of the construction company under the contract.

Paragraph X is as follows:

"The certificate of shares of stock of the Salmon River Canal Company, Limited, shall be made to indicate and define the interests thereby represented in the said system, to wit: A water right of one-hundredth of a cubic foot per second for each acre of land irrigated as provided in paragraphs IV and VIII of this contract and a proportionate interest in the said canal and irrigation works based upon the number of shares ultimately sold therein.

"While the party of the second part shall retain control of the said Salmon River Canal Company, Limited, water shall be measured to users from the place of diversion at the main laterals · of such irrigation system in such quantities and at such times as the condition of the crops and the weather may determine but according to such rules and regulations, based upon a system of distribution of water to the irrigators in turn and by rotation as will best protect and serve the interests of all the users of water from said canal system.

"It is agreed that said system of distribution by rotation shall be devised by the party of the second part and used by the Salmon River Canal Company, Limited, in case the necessity arises during the period while it retains the management of the Salmon River Canal Company, Limited.

"The sale of the water rights to the purchasers shall be a dedication of the waters to the lands to which the same is to be applied. Water shall only be delivered through said system during the irrigation season, to wit, between April 1st and November 1st of each year. A domestic supply when necessary outside of the irrigation season shall be delivered under such rules and regulations and under such terms and conditions as shall be determined by said Salmon River Canal Company, Limited."

By paragraph XI the construction company agreed to so construct the system as that the water conducted through it should be available at a point not to exceed one-half mile measured in a direct line from each quarter section of land to be reclaimed and irrigated, and that it would construct and place in position all headgates and other devices for the control and measurement of the water in the main canals and reservoirs and in the main laterals; it being intended that the settler should, under the directions of the chief engineer of the construction company, furnish but one measuring gate or device for his own use, and that for each year after January 1, 1911, while the construction company retains control of the canal company, the latter should charge and assess the purchasers of water rights 35 cents an acre, which amount, if insufficient to maintain and keep the system in· repair, would be supplemented by additional funds by the construction company up to January 1, 1913, after which date the actual cost of maintenance should be paid by the settlers.

The contract also provided for the diligent and continuous prosecution of the work by the construction company, and its completion within five years, and for the right of the construction company to

mortgage its right, title, and interest in the system, the form of such mortgage to be approved by the Attorney General of the state, and also stated the estimated cost of the work as $2,500,000 and upwards, and also declared that the price at which water rights and for which liens are therein authorized and created against the separate legal subdivisions of land therein described are necessary in order to pay the cost and expenses of reclamation and interest thereon, and that the existing laws under which the contract is made are understood and agreed to be a part thereof.

Under and in pursuance of the contract between the state and the construction company, the latter caused to be organized a corporation called Salmon River Canal Company, Limited, and it caused to be prepared a printed form of a contract, one of which was executed with each of the settlers when purchasing their respective tracts of the desert lands, including the complainants. That contract recited the making of the contract between the construction company and the state; the fact that it had entered upon the construction of the irrigation system for the purpose of diverting the waters that had been appropriated; that the state board of land commissioners had notified it that it might proceed to sell and contract for the use of the water; that the purchaser had made application to the company to be permitted to purchase the particular piece of land, which application had been accepted subject to the approval of the board of land commissioners, which approval had been given; and that for a certain consideration stated the construction company agreed that, in pursuance of its contract with the state, the purchaser should be entitled to a certain stated number of shares of the capital stock of the Salmon River Canal Company, Limited, the certificate of which company should be and was as follows:

"Salmon River Canal Company, Limited.
"...... Shares.                                                        ......, 19....
    "This is to certify ...... is the owner of ...... shares of the capital stock of the Salmon River Canal Company, Limited.
    "This certificate entitles the owner thereof to receive one-hundredth of a cubic foot of water per acre per second of time for the following described land:

---

in accordance with the terms of the contract between the state of Idaho and the Twin Falls Salmon River Land & Water Company and this certificate also entitles the owner to a proportionate interest in the dam, canal, water rights and all other rights and franchises of the Twin Falls Salmon River Land & Water Company, based upon the number of shares finally sold in accordance with the said contract between the said company and the State of Idaho.                                   Salmon River Canal Company, Limited,
                                                       "By ————, President.
    "Attest: ————, Secretary."

The contract with the settlers further provides that the water to which the purchaser is entitled and should receive through the irrigation system should be used upon and become dedicated and appurtenant to the specific piece of land so purchased; and, further, that the laws of the state and the contract made with it by the construction company should be regarded as defining the rights of the respective parties

to the settler's contract, and should regulate the provisions regarding the shares of stock to be issued to the purchaser by the canal company; that the latter company should have power to levy all necessary assessments upon all users of the water in proportion to their respective holdings of stock, but that no such charges should be made until after January 1, 1911, from which date the annual charge for maintenance should not, during the period prescribed in the contract between the construction company and the state, exceed 35 cents for each acre, which payment the purchaser agreed to make to the canal company on the 1st day of April of each year.

The contract between the construction company and the settlers also contains provisions concerning the amount paid and to be paid for the water right, for the assignment by the purchaser of the stock in the canal company to the construction company as security, and the agreement by the purchaser that immediately upon transfer to him of the legal title to the land he would execute to the construction company a mortgage or deed of trust thereon as security for the performance by the purchaser of the provisions of the contract; such mortgage or deed of trust to be in such form as the state board of land commissioners should approve.

It is thus seen that the scheme devised to take the benefit of the congressional grant involved the legal appropriation of the necessary water, a proposed plan by the appropriator for the construction of the necessary irrigation system, which plan should have the approval of the state board of land commissioners, and subsequently the approval of the Secretary of the Interior. Upon the approval of the latter officer, the segregation from the public domain of that portion of the desert lands in Idaho embraced by the grant and included in the proposed reclamation project followed. The construction of the system necessarily required the furnishing from some source of the money with which to do the work; the compensation to the construction company for the liability assumed by it in procuring the required money and in doing the work must of necessity come from the sale of the lands and of rights to the appropriated water; and of that fact both Congress and the state were, of course, well aware, as is shown by the legislation that has been referred to. In the execution of the project, the contract between the state and the construction company, and the contract between that company and the settlers, were made. Manifestly, they are to be read together and in connection with the statutes of Congress and of the state, to which the contracts expressly referred. The construction company, the settlers, and the parties who furnished the money for the building of the system, receiving as security therefor the liens authorized both by Congress and the state, are therefore, each and all, charged with full knowledge of the laws and of the provisions of the contracts. The difficulties that have arisen grow out of the fact, discovered, unfortunately, too late, that, instead of the appropriation of the waters of the stream amounting in fact to 1,500 cubic feet per second, the supply, as shown by the record and according to the practical concession of the parties, was only about one-third of that amount—wholly insufficient for the reclamation and irri-

gation of the entire tract segregated by the Secretary of the Interior, and also insufficient, it is claimed, for at least the proper irrigation of all of the lands covered by contracts of sale actually issued by the construction company to settlers.

Turning to the statutes (above referred to) of the state that owned the water that was authorized to be appropriated, it is seen that no user under such appropriation shall be entitled to the use of more water than can be beneficially applied on the land for the benefit of which the right is given. None of the decisions of the Supreme Court of the state that have been cited hold that the statute does not mean what it plainly says. We make this observation in view of the suggestion made in the opinion of the learned judge of the court below, where it is said:

"If the right granted is too great and the settler attempts to use water wastefully, that is a matter of which the state and other appropriators upon the stream may complain; it is no concern of the defendants."

The contracts of sale by the construction company cannot, in our opinion, be held to convey to the settlers a right to more water than can be beneficially applied on the land agreed to be conveyed to them.

The court below held and adjudged, as has been seen, that that company contracted with the state and the settlers to furnish them with water "at the rate of two and three-fourths acre feet per acre measured at the points of delivery from the system into the consumers' laterals; and further that it would not sell rights in excess" of its available supply. The point of delivery thus adjudged by the court is in entire conformity with the express language of the contract between the state and the construction company, and in view of the fact, shown by the record and which is here undisputed, that the construction company has already sold water rights far beyond the available supply of water, we are also of opinion that the court below was entirely right in enjoining it from making any further sales.

We are, however, unable to find anything in either of the contracts justifying the court in adjudging that the amount of water agreed to be furnished to the settlers should be "at the rate of two and three-fourths acre feet per acre." The only place in either of them where "two and three-fourths acre feet per acre" is mentioned is in paragraph IV of the contract between the state and the construction company, which we repeat:

"IV. The party of the second part is the owner of that certain water right evidenced by permit No. 2659 for 1,500 cubic feet per second of the waters of Salmon river in Twin Falls county, state of Idaho, issued by the state engineer of the state of Idaho, to be used for the irrigation of the lands described in Exhibit A herewith, together with other lands susceptible of irrigation from said system, which water right is hereby dedicated for use upon said lands and it is agreed and understood that the dam hereinbefore mentioned shall be constructed so as to provide a reservoir for the impounding of 180,000 acre feet of water, which amount, in addition to the normal flow of the said stream during the irrigation period, has been determined to be sufficient to furnish two and three-fourths acre feet of water per acre for each acre of land to be irrigated. And the second party promises and agrees to build and construct the canal and lateral system of sufficient capacity to deliver water to the users thereof at the rate of one-hundredth of a second foot per acre for each acre of land to be irrigated."

It must be remembered that in paragraph I of the contract between the state and the construction company it is expressly provided that the company should sell shares or water rights in the system to be constructed, not only to those filing on the government lands embraced by the grant made by Congress, but to the owners of other lands susceptible of irrigation from the system or from any extension or enlargement thereof; and the paragraph last quoted (the fourth) contains substantially the same provision; so that it is readily seen that the statement in paragraph IV forming the basis of the ruling of the trial court now under consideration simply is that the construction company is the owner of the water right evidenced by the permit issued by the state engineer of 1,500 cubic feet per second of the waters of Salmon river, which water right is by the contract "dedicated for use upon said lands," that is to say, the lands embraced by the congressional grant and the other lands susceptible of irrigation from the system, and, further, that it is agreed and understood that the contemplated dam should be so constructed as to provide a reservoir for the impounding of 180,000 acre feet of water, which amount, in addition to the normal flow of the stream during the irrigating period, "has been determined to be sufficient to furnish two and three-fourths acre feet of water per acre for each acre of land to be irrigated"—not only the lands covered by the grant from Congress, but also the other lands under the system.

The word "determined," so used, was evidently used in the sense of estimated; for in the nature of things it could not then—in advance of even the beginning of any work or the actual diversion of any of the water—be known what would be the exact capacity of the system. It was necessarily but the estimate of the proposer of the plan approved by the state engineer and the state board of land commissioners, and subsequently by the Secretary of the Interior in segregating the tract applied for from the public domain. How greatly all of them erred in their estimate is shown by the record in the case; the capacity of the system being, as has been said, only about one-third of what it was then thought it would be.

There is in the record no evidence even tending to show any fraud on the part of any one connected with the undertaking. And in so far as concerns the construction company, compensation for the responsibilities assumed by it and for its efforts could come only from the success of the enterprise; so, too, in respect to those who furnished the money with which to build the works, their security for the money loaned depended upon its success.

[3] In the very recent decision by the Supreme Court of Idaho, rendered January 26, 1917, in the case entitled State of Idaho and Robert Rayl, Plaintiffs, v. Twin Falls Salmon River Land & Irrigation Company, a Corporation, and Salmon River Canal Company, Limited, Defendants, and A. E. Caldwell et al., Interveners, 166 Pac. 220, which was an application for a writ of mandate to compel the construction company to sell to the owner of a school section of desert land within the Salmon River Project, a water right, Chief Justice Sullivan, in the course of his opinion denying the writ, held that the action of

the Secretary of the Interior in approving the proposed plan for the irrigation of the lands applied for by the state and in making the order segregating those lands from the public domain was a conclusive determination against the United States that the state of Idaho was entitled to a patent therefor for the benefit of the settlers. One of the justices of the court (specially concurring for certain reasons) dissented from that view on the ground that that is a question for the determination of the Department of the Interior "and, possibly for the federal courts"; the other of the three justices of the court concurred "in the conclusion of Chief Justice Sullivan under the facts of this particular case."

We are not sure that the latter concurrence can, in view of the many points discussed by the learned Chief Justice, be properly held to be a concurrence in his holding respecting the effect of the action of the Secretary of the Interior in approving the proposed plan that was adopted by the state officials and in making the segregation asked for by the state; but, so conceding, we feel bound to hold to the contrary in view of the express language of the grant authorizing the issuance of the government patents, providing, in effect, as we construe the two acts of August 18, 1894, and June 11, 1896, that an ample supply of water for the land be actually furnished as a condition precedent to the issuance of such patents. It is obvious that whether or not such a supply is actually furnished is a pure question of fact; and that all questions of fact in relation to all of the public lands are matters for the exclusive determination of the officers of the Land Department has been so many times decided by the Supreme and other federal courts as to render the citation of cases unnecessary. To what extent the Secretary of the Interior will, in determining the facts, take into consideration the approval of the plan by himself as well as by the state officials, and his order segregating the tract applied for from the public domain, will be for him to consider and determine.

But we cannot at all agree to the contention on the part of the appellants that no specific amount of water was sold to the settlers; for, turning to the contracts, it is seen that the construction company did, by paragraphs IV, VIII, and X of its contract with the state, in effect, expressly promise and agree that the water rights of the respective settlers should be "one-hundredth of a second foot per acre for each acre of land to be irrigated"; and by its contract made with the settlers it distinctly agreed that their respective water rights should be that specific amount, the certificate of stock in its holding and operating company (the Canal Company) delivered to such settlers expressly declaring that it "entitles the owner thereof to receive one-hundredth of a cubic foot of water per acre per second of time" for the irrigation of his land, and "also entitles the owner to a proportionate interest in the dam, canal, water rights, and all other rights and franchises of the Twin Falls Salmon River Land & Water Company, based upon the number of shares finally sold in accordance with the said contract between the said company and the state of Idaho."

We therefore regard it as clear that the water rights the respective

242 F.—13

settlers are entitled to under and by virtue of the contracts of the parties are one-hundredth of a cubic foot of water per acre per second of time during the irrigating season, with an incidental proportionate interest in the dam, canal, water rights, and all other rights and franchises of the construction company, based upon the number of shares finally sold in accordance with the contract between that company and the state; such amount to be measured to the users, as is expressly declared in paragraph X of the contract between the state and the construction company (during the time the latter retains control of the canal company), "at the main laterals of such irrigation system in such quantities and at such times as the condition of the crops and the weather may determine but according to such rules and regulations, based upon a system of distribution of water to the irrigators in turn and by rotation as will best protect and serve the interests of all the users of water from said canal system."

It therefore appears by the express declaration of the contract between the parties that the specific amount of water sold to the respective settlers is not a constant flow of that amount, but to be delivered and received in rotation; and such, as we understand, is the almost if not quite universal custom under similar systems of irrigation works. It may be that such amount so used may prove insufficient for the proper irrigation of these lands, but it is most obvious that the interests of all of the parties concerned demand the utmost care in the distribution and use of the water, to the end that the best results possible may be obtained. When the well-known fact is remembered that desert lands after cultivation can produce profitable crops with less water than when new, and that a very considerable quantity of the lands embraced within the present project have, according to the record, been abandoned, with the possibility that more may be, it is at least to be hoped that of the remainder a success may be made for all concerned.

The suggestion made on behalf of the appellees to the effect that their rights are prior to those of the settlers subsequently purchasing, and that they are entitled to have such subsequent purchases as conflict with their asserted rights annulled by a decree of the court, is conclusively answered by this express provision of paragraph VI of the contract between the state and the construction company:

"That to the extent of the capacity of the irrigation works and to the extent of the water rights to which it is entitled as rapidly as the lands are open for entry and settlement, it will sell or contract to sell water rights or shares for land to be filed upon to the qualified entrymen or purchasers without preference or partiality other than that based upon priority of application, it being understood, however, that priority of application or priority of entry or settlement shall not give any priority of right to the use of water flowing through the canal against subsequent purchasers but shall entitle the purchaser to a proportionate interest only therein, the water rights having been taken for the benefit of the entire tract of land to be irrigated from the system. The priority of application upon the opening days shall be determined by a system to be devised under the direction of the state board of land commissioners."

It results from what has been said that those portions of the interlocutory decree appealed from which adjudge the settlers entitled to

water at the rate of 2¾ acre feet per acre and enjoin the appellants Commonwealth Trust Company of Pittsburgh, trustee, and A. C. Robinson, from collecting or enforcing payments from them until such adjudged amount of water is furnished them, must be and is reversed, and the cause remanded, with directions to the court below to modify the decree accordingly, and for further proceedings in accordance with the views above expressed; each party to pay their own costs in this court.