## TWIN FALLS OAKLEY LAND & WATER CO. v. MARTENS et al.*

(Circuit Court of Appeals, Ninth Circuit. March 9, 1921.)

No. 3478.

1. **Waters and water courses ☞254—Purchaser of water right and stockholder of company held to have acquired right to specified quantity of water.**

   A purchaser of a water right from a corporation operating under the Carey Act (Comp. St. § 4685) and the laws of Idaho, accepting it, whose contract entitled him to a stated number of shares in a water company to be formed, which would give him 1½ acre feet of water per acre of land, has a contract right with the construction company to receive the specified quantity of water.

2. **Waters and water courses ☞254—Company constructing irrigation project under Carey Act held authorized to contract to sell stated quantity of water.**

   Comp. Laws Idaho, tit. 26, c. 136 (Comp. St. § 2996 et seq.), accepting the Carey Act (Comp. St. § 4685), and authorizing contracts for the reclamation and settlement of land under an irrigation project under that act, authorized a company constructing an irrigation project under that act to make a contract by which it assumed responsibility to the settler to furnish a specific quantity of water.

3. **Waters and water courses ☞254—Mistake of engineer in approving project does not relieve company from contract to supply water.**

   Under Rev. Codes Idaho, § 1618, requiring the state engineer to report on an irrigation project initiated by a proposer, the mistake of the engineer in approving as feasible a project for the irrigation of land under

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Rehearing denied June 6, 1921.

the Carey Act (Comp. St. § 4685), when the available water supply was insufficient for the purpose, does not relieve the construction company from its contract to furnish the settlers with the stated quantity of water.

**4. Waters and water courses ☞222—Patent under Carey Act held not conclusive water supply was ample.**

The decision of the Land Department in issuing a patent to the state under the Carey Act (Comp. St. § 4685), though conclusive for the purpose of the patent that the water supply was ample for the irrigation of the lands patented, is not conclusive in a suit to foreclose the lien for water rights furnished to patented lands, where there were other settlers on unpatented lands holding similar water contracts, whom the company recognized as entitled to the water, so that the patented lands did not receive their full supply, since equity will not deprive the holders of unpatented lands of their rights without a hearing, though under Rev. Codes Idaho, § 1629, the water rights became appurtenant to the land when title passed from the United States to the state.

**5. Waters and water courses ☞258—Lien for water payments reduced in proportion to reduction of water supply.**

In a suit to foreclose the lien for payments on the contract for the supply of water under the Carey Act (Comp. St. § 4685), where it appeared the company had failed to perform its contract to furnish a specified quantity of water for the lands, but it also appeared that it furnished some water, which the settler accepted and used, though it was insufficient for the proper irrigation of his land, the amount of the lien was properly reduced in proportion to the reduction of the water supplied.

**6. Limitation of actions ☞51(2)—Does not run from default on installment giving option to declare all due.**

The statute of limitations does not run from the date of default in payment of an installment, but from the date the last installment becomes due, and a provision authorizing the creditor to declare the entire sum due for default in any payment is a mere option, which, unless exercised, does not set the statute in motion.

Appeal from the District Court of the United States for the Southern Division of the District of Idaho; Frank S. Dietrich, Judge.

Suit by the Twin Falls Oakley Land & Water Company, a corporation, against John H. Martens and others, to foreclose a lien. From a decree authorizing sale for a part only of the amount of lien claimed, the complainant appeals, and defendants file cross-appeal. Decree set aside, and case remanded, with directions to enter a new decree, modified in accord with the opinion.

In a suit in foreclosure of a lien against Martens and others the Twin Falls Land & Water Company, a construction company, was awarded a decree giving it a lien under the act of Congress approved August 18, 1894 (28 Stat. 372, 422 [Comp. St. § 4685]), known as the Carey Act, and the acts amendatory thereof, and the laws of Idaho accepting the same and supplementary thereto. The decree authorizes the company to sell under the lien for seven-ninths, instead of the whole, of the deferred payments accrued at the time of the decree on the purchase price for water rights, which the court found the company had agreed to furnish to the appellees to irrigate and reclaim lands. There is also a cross-appeal on the part of the appellees.

The construction company contends that, because of default in making deferred payments on the purchase price of water rights under the terms of the contract, there is a right to declare the entire amount of the purchase price due and payable. The defendants contend that no right of foreclosure existed, and that no lien attached, and no lien could be foreclosed until an ample supply of water was furnished—1½ feet per acre.

In September, 1909, Martens filed on 160 acres of the land within a segregated area, and made four contracts with the company for 160 shares of water right of 1½ acre feet per share of water from the system. He was to make an initial payment and pay installments thereafter; but he has failed to make the deferred payments. Martens assigned to the defendant Moyes, and Moyes assigned to the defendant Walker. The contract between Martens and the company, after referring to the fact that authority was given by the state land board to the company to sell water rights, provides in substance as follows:.

That in consideration of $120 cash and of other covenants the purchaser shall become entitled to 40 shares of the capital stock of the Oakley Canal Company to be formed, the certificate of ownership in that company to be in the form set forth in the contract. The certificate sets forth that the purchaser is the owner of ——— shares of capital stock in the Oakley Company and is entitled "to a water right of 1½ acre feet of water for each acre" in accordance with the terms of the contract between the state and the Twin Falls Oakley Land & Water Company, dated August 12, 1909, and also entitles the owner to a proportionate interest in the dam, canal works, and water rights, with all the rights and franchises attached thereto, based upon the number of shares finally sold in accordance with the contract between the company and the state. The contract further provides that, in case of default by the purchaser in payment of principal or interest, the company may declare the entire amount of the principal purchase price for the water rights due, "and may proceed either in law or equity to collect the same and to enforce any lien which it may have upon the water rights hereby contracted or upon the lands." It was further provided that, when payment was made to the construction company, that company should have a lien upon any interest the purchaser has or may acquire in the land for the actual cost and necessary expenses of reclamation and reasonable interest thereon. Further provisions are that the agreement is made in accord with the provisions of the contract between the state and the company, which, together with the laws of Idaho, should be regarded as defining the rights of the parties, and should regulate the provisions of the shares of stock to be issued to the purchaser by the Oakley Canal Company.

The contract, dated August 12, 1909, between the state and the company, contains certain relevant features which are summarized as follows:

The company agreed to build a system and to sell shares of water rights therein to persons filing upon the land, and to transfer ownership and control of the irrigation system to the purchasers of shares of water rights; held itself to be the owner of certain water rights, aggregating 80,000 miner's inches, of which water rights the company was to convey to the Oakley Canal Company, to be a holding and operating company, a sufficient quantity so that there might be furnished to the irrigation system, and to the owners of shares therein, to the extent of 1½ acre feet of water during the irrigation season. The Oakley Canal Company was to be organized, with one share in that company for each acre of land, the Oakley Company to have ownership and control in due course; each owner to have shares corresponding to the number of acres of land for which he had water rights. All water rights were to be upon the same footing, without regard to pro rata or purchase or use, but no water rights or shares were to be dedicated or sold beyond the carrying capacity of the canal, or in excess of the appropriation of water as set forth in the water permits mentioned. As per lists attached to the contract the aggregate of lands to be irrigated was about 43,000 acres, including approximately 10,000 acres held in private ownership.

Before the sales, and before the system was built, the company advertised a great Carey Act opening of 38,000 acres, with full water rights, perfect and adequate. Lands with water rights were sold including the contracts under consideration. The total acrea, including patented lands, entitled to water from the project, was about 38,703 acres. But the water supply was entirely inadequate to furnish water at the rate of 1.5 acre feet for so large an area. It appears that upon the run-off of the streams there were extensive private early rights, which existed at the time of the contracts between the

company and the settlers. The result was that what water was left as subject to appropriation by the company was not as great as its record rights. A reduction in the area of the project was considered, and reclamation of more than 29,000 acres of Carey Act lands, for which water rights were contracted, was abandoned, and consideration confined to water rights for the 29,000 acres and the 9,691 acres of patented land.

The District Court found that water was first impounded in the reservoir in 1912 and 1913, and that on May 13, 1913, there was in the reservoir 30,000 acre feet; that on December 30, 1914, the Idaho State Land Board took steps to procure patent for 20,500 acres, and ordered that no further water rights be sold pending investigation into the available water supply. In March, 1918, the State Board authorized application for patent for certain of the Carey Act entries, and selected lands in a compact body, with a view of procuring water supply sufficient for 20,500 acres, and it appears that in December, 1918, since this litigation was commenced, the Secretary of the Interior has issued to the state of Idaho a patent for the lands so selected, including entries of these defendants, aggregating 10,910 acres, which, together with the 9,691 acres held by old settlers, makes a total of approximately 20,600 acres.

It further appears: That the Secretary of the Interior has indicated that upon application by the state patents up to 24,000 acres may issue; that all lands above that amount have been released by the company to the state; that none of the Carey Act lands, within the 38,000 acres, within the project, have as yet been restored to public entry. It is to be understood from the record that there are outstanding uncanceled contracts for 26,000 acres, it may be 27,000, and outstanding contracts for 6,000 acres of unpatented Carey Act lands; that of the 6,000 acres of Carey Act lands unpatented, but for which there are outstanding contracts, excluded by the State Land Board from its application for patent, entries aggregating at least 3,700 acres were improved and have been in cultivation for three years, and that all of the 6,000 acres either had certificate of proof of reclamation or were entitled thereto; and the company recognizes the right of these lands to have water. The District Court added the 3,700 improved to the 20,500 acres patented, and, adding also other lands upon which contracts are held, concluded that there were 27,000 acres within the project, upon which the company has contracts, and to which it is under agreement to furnish water.

Samuel H. Hays and Richards & Haga, all of Boise, Idaho, for appellant.

W. L. Dunn, of Oakley, Idaho, for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). [1] We are of opinion that the defendant acquired a contract right to 1.5 acre feet of water under his contract with the water company. The fact that the right so acquired was specified in the certificate of stock does not lessen the obligation of the company to furnish the defined amount. In the light of the inducements offered to settlers it is evident that the company intended to sell, and must be held to have agreed to sell, the specific amount of water named in the certificate. The act of the company in relinquishing certain lands to the state is evidence, too, that sales made by the company, in excess of the available supply had, were improperly made. Twin Falls Salmon River Land & Water Co. v. Caldwell, 242 Fed. 177, 155 C. C. A. 17.

[2] It is argued that all parts of the contract must be construed together, and that the stock certificate, in so far as it pertained to the extent of ownership, when considered with the terms of the contract,

shows that there was "no deduction for a shortage coming within its terms." It is also said that the rights claimed by the settler are under the Carey Act, and that inasmuch as the act provides that the lands would be patented when an ample supply of water is actually furnished, the matter is placed within the jurisdiction of the Land Department of the United States, and that a contract made for water supply by the state or the settler is not binding, and that the whole question is with the Department of the Interior. But under the act of the Legislature of Idaho accepting the Carey Act (chapter 136, tit. 26, Comp. Laws of Idaho) the state was authorized to make all necessary contracts to cause the lands to be reclaimed, and "to induce their settlement and cultivation in accordance with and subject to the provisions" of the act. Reading the statutes together, it is plain that authority was given to the construction company to make and execute a contract, and to assume a responsibility to the settler under which there could be agreements for deferred payments and under which the company might agree to furnish a specific quantity of water.

[3] Nor is it material that the state engineer, in performing his duties, may have erred in his judgment as to the feasibility of the project. Section 1618 of the Revised Code of Idaho contemplates a report by the state engineer, not upon a proposition of his, but upon one initiated by a proposer. Basinger v. Taylor, 30 Idaho, 289, 164 Pac. 522. It was primarily the Irrigation Company that erred in its judgment. But as it made the contracts with the settlers, who relied upon the ability of the company to live up to its contract, and who have obligated themselves to make deferred payments, results must be reached upon a recognition of the contractual relationship.

The District Court took the data for seven years of the operation of the system, and all the gross run-off, and of the estimated reservoir losses and loss sustained in distribution, and considered what service could be expected of the system for the entire contract entitled to receive water therefrom, and taking the total acreage, and the total amount of water which experience showed may be available from year to year, and considering what had actually been supplied, concluded that the finding substantially as made by the board of the state of Idaho was correct, namely, that the available supply was adequate for only 21,000 acres at the rate of 1.5 acre feet. The estimates and the data upon which the District Court based its conclusions serve to show the difficulty of arriving at perfectly satisfactory results; but our judgment is that the learned judge was fair in his deductions, and that upon the basis he adopted the defendants can only receive for their lands a fraction of the water for which they agreed to pay the amounts named in the contract, provided lands in excess of 21,000 acres are included.

[4] The Land Department in Washington presumably issued its patent upon the assumption that the patented lands will get all the water. Act Cong. June 11, 1896. But there are the unpatented lands, which it is contended the state Land Board and the federal Land Office are not empowered to exclude from the right to receive water;

and, as already stated, the company endeavors to recognize a right of water for these unpatented lands, and continues to deliver water to them, as well as to patented lands. Many entrymen upon those lands have improved them, and, at least until after full opportunity is afforded such entrymen for hearing, we are not ready to say that, where they have complied with the law, they are to be put in a position where all the water must go to patented lands, and that their lands may be rendered useless and their claim of vested rights ignored.

We believe that, in a proceeding to ascertain whether patents should issue, the finding by the Land Department upon the question whether the water supply is ample is conclusive for the purpose of issuing patent; but that is far from ruling that it is conclusive upon the question whether the plaintiff construction company has provided water at the rate of 1.5 acre feet per acre as required by its contract with the settler. That is a matter which the Land Department has not undertaken to pass upon, and could not. The Land Department in Washington never has determined that the water is sufficient for a greater amount of land than approximately 21,000 acres, and the patents issued upon the applications by the state Land Board, representing that there was a sufficient supply of water for the lands to be included in the patent, do not mean that necessarily the United States intended a result that would deprive the excluded lands from their ratable share in the use of water, under the terms of the contract between the company and the settler.

It is correct that, generally, the lien applies only to reclaimed lands, and under Revised Codes Idaho, § 1629, the water rights to all lands acquired shall attach to and become appurtenant to the land as soon as title passed from the United States to the state. But it does not follow that a finding that there is only seven-ninths of 1.5 acre feet per acre, and that such quantity is somewhat less than good husbandry requires, is in such conflict with the decision of the Interior Department that there is an ample supply of water, that a court of equity cannot make a decree, as between the company and the settler, which will have regard for the total acreage of 27,000 acres for which obligations exist. It may be that upon further application the Interior Department will issue patent for more acres; but such possible action is much too speculative a ground upon which, in this suit, to found a decree which will deprive the improved unpatented lands of their share of water.

[5] The sequel of these views is that, while the furnishing company shall have a lien on the water right and land for deferred payments for the water right until the last deferred payment is paid off and satisfied, the lien is expressly founded upon the contract for the water right, and the right of foreclosure upon default must be "according to the terms and conditions of the contract granting and selling to the settler the water right." Section 1629 of the Revised Codes of Idaho. Such is the lien created by the law of the state of Idaho, acting under the authority conferred by the amendment to the Carey Act approved June 11, 1896 (29 Stat. 413–434).

271 F.—28

But, as the appellant company failed to deliver a quantity of water sufficient to comply with its contract and to enable the defendant to reclaim his land, it cannot rely upon the contract as ground of foreclosure for the full amount of deferred payments. On the other hand, defendant has had the use of a substantial quantity of water furnished by the company since 1913, and although such quantity is less than he was entitled to have, and less than his land required for good husbandry, still it was furnished to him, and used by him according to the general provisions of the contract, and in view of his default in payments he ought not to be permitted to defeat foreclosure of the lien to an extent commensurate with the quantity of water furnished; hence a decree that, inasmuch as defendant will only receive seven-ninths of the water agreed to be furnished, the lien should be foreclosed accordingly, and that the settler should only be required to pay seven-ninths of the contracted for price is equitable and proper.

[6] We think, however, that the statute of limitations ought not to have been considered as running against any installment. The entire debt was not matured when the suit was filed; the last installment not being due until April, 1922. The statute does not run from the date of a partial default, but rather from the date the last installment becomes due. Dighton v. First Exchange Nat. Bank (Idaho) 192 Pac. 832; McCarty v. Goodsman, 39 N. D. 389, 167 N. W. 503, L. R. A. 1918F, 160; Core v. Smith, 23 Okl. 909, 102 Pac. 114; 13 Am. & Eng. Enc. of Law, 793; 27 Cyc. 1560. The rule of the decisions cited is that a provision such as there is in the contract here involved, which provides that upon default in the payment of any of the payments specified in the contract, or of the interest thereon, the company may declare the entire amount of the principal purchase price for said water rights due and proceed to enforce any lien, is a mere option for the benefit of the mortgagee, which, unless exercised, does not set the statute in motion.

The necessary computations to carry out our views should be made by the District Court, when the case is again in that court. In all material respects, except the application of the statute of limitations, we believe the theory adopted by the District Court as to the ascertainment of sums due and interest allowances was as precise as could be made with regard to the equities of the case.

The order will be that the decree appealed from is set aside, and the case is remanded to the District Court, with directions to enter a new decree, modified in accord with the views of this opinion.