# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS, THE DISTRICT COURTS, AND THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA

---

### COMMONWEALTH TRUST CO. OF PITTSBURGH v. SMITH et al.[*]

(Circuit Court of Appeals, Ninth Circuit. May 16, 1921.)

No. 3625.

1. **Cancellation of instruments ☞35(1)—Equity ☞94—"Indispensable parties" are those necessary to final determination; all parties to contract are indispensable in suit to cancel.**

   "Indispensable parties" are persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest or leaving the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience; as, for example, in a bill to rescind, all parties to the contract are indispensable.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Indispensable Party.]

2. **Waters and water courses ☞222—In suit to foreclose contractor's lien on water rights and land segregated under Carey Act, all contract holders necessary parties.**

   Where, on application of the state of Idaho, through its board of land commissioners, desert lands were segregated from the public domain under the Carey Act (Comp. St. § 4685), and the state entered into a contract for the construction of irrigation works, the contractor, as compensation, to have the lien given by the acts of Congress, all contract holders within the limits of the project should be made parties to a suit to foreclose the lien on water rights and privileges and the land appurtenant of particular purchasers, where as a result of later developments it appeared that less land could be irrigated than was first expected, and the limits of the district were several times reduced, for that would result, not only in increasing the amount to be paid by particular purchasers for water, but might compel purchasers to accept a reduction in the amount of water received, so that, notwithstanding provisions of C. S. Idaho 1919, §§ 3004, 3019, 3021, and 3045, relating to foreclosure, it would be necessary, as the rights of all contract holders would be affected by the rights of others, that all be made parties.

3. **Waters and water courses ☞222—Lien of construction company extends only to acreage for which it furnishes adequate water supply.**

   Where, on application of the state of Idaho, desert lands were segregated from the public domain, and a construction company undertook to construct irrigation works, receiving as compensation the lien provided

for by act of Congress, etc., the lien of the construction company can extend only to the acreage for which it furnishes an adequate supply of water.

Appeal from District Court of the United States for the Southern Division of the District of Idaho; Frank S. Dietrich, Judge.

Suit by the Commonwealth Trust Company of Pittsburgh, as trustee, against Max Smith and Margaret Smith. From a decree dismissing the suit for failure to make other parties defendants, plaintiff appeals. Affirmed.

This is a suit to foreclose a lien upon certain water rights and privileges and the real property to which they are appurtenant. It is necessary to understand the controlling issues presented by the pleadings for an intelligent solution of the problem involved. The bill of complaint proceeds upon facts which will be as briefly epitomized as is consistent with clarity:

About August, 1907, the state of Idaho, through its state board of land commissioners, made application to the Secretary of the Interior, under what is known as the Carey Act (Comp. St. § 4685) and acts amendatory thereof, for a segregation from the public domain of approximately 127,707.29 acres of desert land situated in Twin Falls county, Idaho, which lands and other lands in the vicinity to the amount of about 150,000 acres the state represented could be irrigated and reclaimed from the surplus and unappropriated waters of Salmon river, by means of a storage reservoir with an available capacity of 180,000 acre feet, and requisite canals, ditches, laterals, etc. Prior to the making of such application, the state engineer and the state board determined and adjudged, in pursuance of state laws and regulations, that there was sufficient surplus and unappropriated water in Salmon river available for reclamation of said lands to the extent and degree required by the acts of Congress; and the Secretary of the Interior, having also determined that the supply of water was sufficient for the purposes desired, did, on the 10th day of April, 1908, segregate from the public domain and agree to donate, grant, and patent to the state the desert lands described in the application, in the aggregate mentioned and for the purposes as prayed, as contemplated by the acts of Congress and the laws of the state relating to such matters.

About April 30, 1908, the Twin Falls-Salmon River Land & Water Company, herein to be called the construction company, entered into a contract with the state of Idaho, through its board of land commissioners, for the construction of the reservoir, and the necessary tunnels, ditches, etc., to complete the project. In entering into such contract, the construction company, upon the determination of the state and of the Secretary of the Interior that the flood and unappropriated waters of Salmon river available for the project were ample to reclaim the lands to the extent and degree required by the acts of Congress and the laws of the state, agreed to accept as its compensation for constructing the system the lien authorized by the acts of Congress to be created by the state on and against the Carey Act lands, and the lien authorized to be created by the laws of the state, and the consideration that should or ought to be paid under said acts and laws of the state by entrymen and owners of lands for an interest in the irrigation system and water rights. Under the contract it was determined and agreed that the actual cost of the irrigation works and structures would be the sum of $40 per acre when apportioned and distributed equally over the whole 150,000 acres proposed to be reclaimed, and a lien was created by the state in favor of the construction company for actual costs and necessary expenses of reclamation and reasonable interest thereon, estimated at $40 per acre, against each and every legal subdivision segregated from the public domain under the Carey Act pursuant to the state's application. It was further provided in the contract that upon payment of $40 per acre or share in the irrigation system, together with interest thereon, the lien should be satisfied.

It was further provided that a corporation to be known as the Salmon River Canal Company, Limited, herein to be called the operating company, should

be organized to take over the management and operation of the irrigation system, which should be capitalized on the basis of one share of stock to each acre of land to be irrigated under the system, namely, 150,000 shares, and that there should be issued to entrymen or purchasers of the lands, as evidence of their respective shares or interests in the irrigation system, one share of stock for each acre entered or filed upon and susceptible of irrigation from the system, and that the water available therefrom and for distribution should be distributed in accordance with the number of shares of stock held in the operating company by entrymen or owners under the system. Relying upon the correctness of the determinations of the state and the Secretary of the Interior as to the sufficiency of the water supply available, and believing that they were final and binding, the construction company entered upon the work of construction, and thereafter built and constructed the irrigation works theretofore approved by the state, at an expense believed to be $3,500,-000. Such works, it is alleged, have been accepted and approved by the state as completed, and water has been available from the system for the irrigation of the lands described since April 12, 1911, at a point within one-half mile of the lands and premises.

After the construction company had commenced the work of construction, the state demanded that the transfer of shares be limited, so as not to exceed 100,000 acres, and later 80,000 acres, and that the water supply be distributed over and made appurtenant to not more than that number of acres. Immediately after the execution of the contract, the state board of land commissioners gave public notice that the lands so segregated were open to settlement, and of the terms upon which land could be entered or title acquired, that the construction company was authorized to transfer and issue water rights, shares, or interests in the system to qualified entrymen, and that the lands could not be entered until the entryman had entered into a contract with the construction company for the transfer to him for use upon such lands of shares or interests in the works as contemplated by the contract between the construction company and the state.

The state board adopted and approved a form of contract to be used by the construction company for the transfer of shares or interests in the irrigation system to entrymen and owners of lands thereunder, and it was provided therein how the $40 consideration and interest thereon to be paid for each share should be paid, with a further provision that if the purchaser made default in the payment of any installment of principal or interest, the construction company might declare the entire amount of the purchase price at once due and collectible, and proceed either at law or in equity to enforce any lien it might have upon the water rights, shares, or interests to be transferred under such contracts, and upon the land to which the same were appurtenant, and to enforce any other remedy it might have; it being asserted that under the contract the purchaser granted, assigned, and set over, by way of mortgage or pledge to the construction company to secure the amounts due and to become due, the lands to which the water rights, shares, and interests were dedicated, and that the company was given a first and prior lien upon such lands, water rights, shares, and interests, and as additional security that the entryman agreed that shares of stock issued to him should be and were by the terms of the contract assigned to the construction company. The construction company used the form of contract approved by the state board, and all contracts, after execution, were submitted to and approved by such state board.

It is further asserted that, by virtue of the acts of Congress, the laws of the state, the contract between the construction company and the state, and the settlers' contracts, the construction company became entitled to and possessed of a lien against the lands segregated from the public domain for the actual costs of constructing the irrigation system, and the necessary expenses of reclamation, and reasonable interest thereon, also of the lien created by the laws of the state in favor of companies constructing irrigation works, and that the settlers' contracts were intended to render more specific the lien created under the acts of Congress and the laws of the state, and

the lien created thereby was intended to be supplementary to and not in lieu of the lien created by the federal and state laws.

After the state had given notice, as previously stated, the construction company accepted applications for entry, and entered into settlers' contracts and contracts with owners of other desert lands situated under the system, covering approximately 73,000 shares, all of which were approved by the state board; but thereafter, in the year 1916, the state board, in the exercise of its supervisory power over such matters, canceled and annulled entries aggregating approximately 13,000 acres, and thereafter reduced the acreage entitled to water and the number of outstanding shares or interests in the system to approximately 60,070.8, and declined to approve any further contracts, and the defendants in the suit and other owners of land under and shares of stock in the system have combined to reduce the acreage for which water shall be supplied, and have obtained an injunction in the case of A. E. Caldwell and others against the construction company and others, prohibiting the company from selling or transferring any further shares in the irrigation system, and decreeing that the water supply available be distributed over not to exceed 60,070.8 acres; and plaintiff is advised that the state board, about March 13th, made an order that the water available for distribution should be made appurtenant to approximately 35,000 net irrigable acres, and no more, and that the outstanding shares in the system in excess of that should be canceled or reduced accordingly, though no action for reduction has been taken or had. It is asserted that, by reason of the action of the state board and the injunction as aforesaid, the construction company is prevented from supplying water to or obtaining a lien upon more than 60,070.8 acres, and if the later order of the state board, made March 13, 1918, be legal and valid, the money expended by the construction company in the construction of the irrigation system can only be recovered through or by the enforcement of its lien against 35,000 acres; that, if the irrigable acreage is limited to 60,070.8 acres, the actual cost and necessary expense of reclamation and reasonable interest thereon will amount to not less than $60 per acre, and in the event the acreage be further reduced the cost per acre will be further increased.

In pursuance of the notice published, as alleged, persons having the required qualifications made application to the construction company for the purchase of shares in the irrigation system, under the form of contract prescribed by the state board, and the construction company accordingly entered into contracts with such persons, which were approved by the state board. The entries were so made, and the entrymen, after having reclaimed and made settlement upon the lands so entered, made final proof of reclamation and settlement in the manner required by statute and the rules and regulations of the board, which was also accepted, allowed, and approved by the board.

Plaintiff alleges that the entrymen, their successors and assigns, have failed to pay and discharge the liens thus created in favor of the construction company, and that because of such default plaintiff has elected to declare the whole amount, both principal and interest, remaining due and unpaid on such liens, as immediately due and payable, and claims a first and prior lien against the lands and water rights, shares, and interests appurtenant thereto for the actual costs and necessary expenses of reclamation and reasonable interest thereon.

The complaint sets forth the specific demands against the defendants Max Smith and Margaret Smith, the subdivision of land against which the liens are claimed, and the amount thereof. Then it is further alleged that the amount due against each of said legal subdivisions should be increased by $20 per share for the number of shares dedicated or made appurtenant to said land, and in case it be determined that the number of shares or interests outstanding against the system should be restricted to less than 60,070.8 acres, then that the amount due on each of the shares and the amount of the lien should be increased proportionately, to the end that each acre of land entitled to water shall pay its proportionate part of the actual cost of said works and the necessary expenses of reclamation as provided by the acts of Congress and

the laws of the state of Idaho. The prayer proceeds as in the ordinary fore-closure.

The answer of defendants admits in large measure the allegations of the complaint, but in many things enters denial, and in others puts the complainant upon proof. Some of the demands are of matter that would appear to be vital to the controversy. For instance, the defendants deny that the irrigation works were accepted and approved by the state as completed prior to the commencement of this suit; deny that the entrymen, their successors, grantees, or assigns, have failed to discharge any liens created in favor of the construction company against said lands, or have failed to pay any installments of principal or interest as the same became due, or at all, and in that connection allege that the construction company has failed to comply with the laws of the United States by furnishing an ample supply of water in a substantial ditch or canal to reclaim the particular tract or those particular tracts of land as required by the statute and involved in this action, or as required by the contract between the general government and the state of Idaho and the contract between the state and the company; and deny that plaintiff is entitled to a first lien, or any lien at all, against the lands in the complaint described, or against the water rights, shares, or interests appurtenant thereto, under the acts of Congress, or the laws of the state, or the settlers' contracts, or any lien at all for the actual costs and necessary expenses of reclamation, or reasonable interest thereon, or for any sum of money, or at all, until the construction company shall have actually furnished an ample supply of water in a substantial ditch or canal, or by artesian wells or reservoirs, to reclaim the lands, and then only a lien for the security of the payment of $40 per share per acre of land.

By affirmative allegations, the answer reiterates the history of the construction of the irrigation works, and asserts that a fraud was practiced by the construction company and its promoters in acquiring the right to the construction of the works, and that the settlers were induced to enter into their contracts by misrepresentation and fraud, and in short challenges any recovery in behalf of the company or its assigns on account of the so-called liens.

The pleadings being thus formulated, the court on motion of defendants directed that all contract holders or persons, claiming water rights or interests in lands under the segregation be brought in and made parties to the action; and, plaintiff having failed to comply with the order, the cause was dismissed, from which decree the plaintiff appeals.

Richards & Haga, of Boise, Idaho, and A. N. Edwards, of St. Louis, Mo., for appellant.

Turner K. Hackman, of Twin Falls, Idaho, for appellees.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. The single question presented by the appeal is whether the contract holders or the persons claiming water rights or interests in the lands comprised by the project or irrigation system are indispensable parties to the suit, so that the court is unable to proceed in their absence without injuriously affecting them in their rights and privileges. If this is merely a proceeding for the foreclosure of a mortgage lien, and nothing more, then it may confidently be premised that the other contract holders within the project should not be required to be brought in, because they are neither necessary nor indispensable parties, nor is it competent in the ordinary bill of foreclosure to litigate the title of parties claiming adversely to the mortgagor. Dial v. Reynolds, 96 U. S. 340, 24 L. Ed. 644; Peters v. Bowman, 98 U. S. 56, 25 L. Ed. 91.

[1] Indispensable parties are defined as—

"persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." Shields v. Barrow, 17 How. 129, 139, 15 L. Ed. 158.

So it is said in Williams v. Bankhead, 19 Wall. 563, 571, 22 L. Ed. 184:

"Where a person will be directly affected by a decree, he is an indispensable party, unless the parties are too numerous to be brought before the court, when the case is subject to a special rule."

A bill to rescind affords an apt example of the kind. All parties to the contract sought to be annulled must needs be indispensable parties.

[2] The right of the construction company, or its successor, the applicant here, to foreclose its liens, is controverted on the ground that the company has not performed its part of the contract with the settlers whereby its liens were acquired; in other words, that its right to enforce the lien depends upon certain conditions to be performed upon its part, which are conditions precedent to any right of action against the settler to compel him to perform.

It is stipulated between the parties in the settlers' contract for the purchase of shares or interests in the irrigation system that the agreement is made in accordance with the provisions of the contract between the state of Idaho and the company, which, together with the laws of the state of Idaho under which the agreement is made, shall be regarded as defining the rights of the respective parties, and shall regulate the provisions of the shares of stock to be issued to the purchaser by the operating company.

This renders it essential, in order to arrive at the correlative obligations of the parties, to read the settlers' contract in connection with the contract between the construction company and the state, and the state laws relative to the subject, and not only this, but in connection with the statutes of Congress rendering such a project possible. Twin Falls Salmon River Land & W. Co. v. Caldwell, 242 Fed. 177, 190, 155 C. C. A. 17.

Under the contract between the state and the construction company, the company agrees to build the irrigation works and to sell shares or water rights as provided to the person or persons filing upon the lands; also to the owners of other lands not described which are susceptible of irrigation from the system, the shares or water rights to be sold on terms provided, and the management and control of the canal system to be transferred to the purchasers of such shares or water rights.

The construction company represents that it is the owner of 1,500 cubic feet per second of the waters of Salmon river, and agrees that the dam to be constructed shall provide a reservoir for impounding 180,000 acre feet of water, and that it will construct the canal and lateral system of sufficient capacity to deliver water to the users at the rate

of one-hundredth of a second foot per acre for each acre of land to be irrigated.

The construction company further agrees that, to the extent of the irrigation works and to the extent of the water rights to which it is entitled, as rapidly as lands are opened for entry and settlement, it will sell or contract to sell water rights or shares for land to be filed upon by qualified entrymen or purchasers, without preference or partiality other than that based upon priority of application; it being understood, however, that priority of application or priority of entry or settlement shall not give any priority of right to the use of water flowing through the canal against subsequent purchasers, but shall entitle the purchaser to a proportionate interest only therein—the water rights having been taken for the benefit of the entire tract of land to be irrigated by the system.

After further agreement on the part of the construction company to sell or cause to be sold a water right or share in the canal for each and every acre filed upon or purchased from the state or acquired from the United States. it is stipulated that each of said shares or water rights shall represent a carrying capacity in the canal sufficient to deliver water at the rate of one-hundredth of a cubic foot of water per acre per second—each share to represent a proportionate interest in the canal or irrigation works, together with all rights and franchises therein, based upon the number of shares finally sold in said canal; said shares or interests to be sold to persons filing upon the lands at a price not exceeding $40 per share, to be paid in installments as specifically set forth. It is stipulated that in no case shall water rights or shares be dedicated to any lands before mentioned or sold beyond the carrying capacity of the canal or in excess of the appropriation of water therefor. It is further stipulated that the sale of water rights to the purchasers shall be a dedication of the water to the lands to which the same is to be applied.

This recital comprehends sufficiently for the present inquiry the material stipulations on the part of the construction company. Under the act of Congress of June 11, 1896 (29 Stat. 434), a state is authorized to create a lien or liens upon lands granted under the Carey Act to the state, which liens, when created, are declared to be valid on and against the legal subdivisions of land reclaimed for the actual cost and necessary expenses of reclamation and reasonable interest thereon from the date of reclamation until disposed of to actual settlers. The state of Idaho has provided by law that any company furnishing water for any tract of land shall have a first and prior lien on the water right and land upon which the water is used for all deferred payments for said water right, the lien to remain effective until the last deferred payment for the water right is paid and satisfied according to the terms of the contract. Section 3019, St. Idaho 1919.

By the contract with the settler, the purchaser agrees that, upon default in payment of installments, interest, etc., the company may declare the entire purchase price for the water due, and may proceed to collect the same and to enforce any lien it may have upon the water

rights or the land. He also covenants to set over by way of mortgage to the company, to secure the payment of the amounts due or to become due on the purchase price for the water right, any and all interest and all rights which he now has or which may hereafter accrue to him under his contract with the state for the purchase of the lands to which the water rights are dedicated, and, for further assurance, to execute a mortgage to the company to secure the performance by him of the provisions of the contract. The contract sets forth specifically the payments made and. to be made, the time of payment, and the interest agreed upon.

Provision is made by state law authorizing the owner or holder of these liens to foreclose the same on account of default in discharging any of the deferred payments. Section 3021, St. Idaho 1919. And it is further provided that, in the event the owner or holder or occupant of the premises upon which the water has been purchased or contracted for has not at the time of the filing of the claim of lien received title to the premises so occupied or held by him, the proceeding to foreclose shall relate only to the water or water rights. Section 3045. It is also provided, by section 3004, that, should it appear to the department of reclamation that the water supply of the construction company is inadequate to irrigate properly and sufficiently the lands so proposed to be irrigated, or that water rights have been sold to the full carrying capacity of the ditch or canal, or in excess of the actual appropriation or of the supply of water made actually available, the department of reclamation shall have the right to enter an order forbidding the parties from making any further or additional sales of water rights or of shares of stock in any company representing or evidencing water rights, etc.

It appears from the bill of complaint that the construction company entered into settlers' contracts covering approximately 73,000 shares, representing a supply of water to that number of acres under the project; that the state board thereafter, in the exercise of its supervisory control, canceled and annulled entries of approximately 13,000 acres, and accordingly reduced the acreage entitled to water and the number of outstanding shares in the system to approximately 60,070.8, and declined to approve other contracts; that it later made an order that the water available should be made appurtenant to approximately 35,-000 net irrigable acres, and no more. By a stipulation of the parties to this suit, it appears that the general government has issued patents to the state for lands under the project covering 35,000 acres, and declines to issue patent for additional acreage.

By reference to the opinion recently rendered by this court in the case of Twin Falls Salmon River Land & Water Co. et al. v. A. E. Caldwell et al., No. 3502, 272 Fed. 356, it will be seen that the learned trial judge found as a conclusion of fact that the system would not in an average year furnish water to the farmers in excess of 56,500 acre feet on a fair estimate, and that this estimate, distributed on a basis of 2⅓ acre feet per acre, would reduce the irrigable area to 24.-214 acres, instead of 35,000, as found by the state board upon the ad-

vice of the Commissioner of the General Land Office, and accordingly entered a decree which recites in effect, among other things, that the rate of 2⅓ acre feet per acre per season, the amount that is and will continue to be required for the reasonably successful production of crops, is less than one-hundredth of a second foot per acre flowing continuously during the irrigating season, and, as a deduction from still other recitals, that the system can be relied upon to furnish 40 per cent., and no more, of the water which the defendant company by its outstanding contracts agrees to sell and deliver, namely, 140,396 acre feet per season.

So here it will be seen that, by the order of the state board, there has been a constant and continuous reduction of the irrigable area that can be supplied with water from the project in quantity sufficient to meet the demands of practicable husbandry; and it may be remarked that the plaintiff by its complaint seems not to challenge specifically the power of the state board to make such delimitations from time to time, governed by the water supply which the company is able to make available for irrigation purposes under the project. In addition, the findings of the learned trial judge indicate that the water supply available is adequate to irrigate properly but 24,214 acres.

It is obvious that many persons—that is, contract holders—are and will necessarily be affected by the inadequacy of the water supply considered in relation to the amount that it was at first supposed could be made available. They are affected in several ways. Some will and can get no water at all, as their holdings are entirely outside of the reduced delimitations. Others, and a major portion of them, perhaps all, will be required to take and accept fewer acre feet per acre of water than they have contracted for, and some are bound to be affected in ways not now apparent by the readjustment of the water supply to the delimited area. Then there is the contention of the plaintiff that all the water users who will finally be entitled to water must be required to pay, not $40 per share for each share or interest in the system, but $60 and a greater sum according as the acreage subject to irrigation from the system is reduced by delimitations made, or that will of necessity be required to be made, to meet the inadequacy of the supply of water available for irrigation purposes.

It is the very theory and purpose of the bill of complaint, as becomes apparent from a reading of it, to enforce the alleged lien for the larger amount, so as to require the diminished area to bear the burden of the entire cost of construction. It is obvious, therefore, that in a comprehensive, equitable, and fair readjustment of the matters pertaining to the unfortunate situation, all the contract holders will be affected in a greater or less degree, and that the rights of each shareholder are more or less dependent upon the rights of every other shareholder. This manifestly and necessarily will affect in greater or less degree the extent and dignity of the rights and holdings of a very great number, if not all, of the contract holders of shares under the project. So it would appear that a final decree cannot be made or entered in the case at bar without affecting materially perhaps all the contract holders

in the project, or at least without leaving the controversy in such condition that its final determination may be wholly inconsistent with equity and good conscience. The suit, considered in respect to the correlative rights involved, is not one for foreclosure merely, but by nature resembles more nearly one for specific performance, the termination of which will perforce of its very consequences affect in some measure all the contract holders by reason of the inability of the construction company fully to perform on its part.

This result has been practically reached by the decision of this court in Twin Falls Salmon River Land & Water Co. et al. v. Caldwell, supra. True it is that the state statute has made provision whereby the construction company is entitled to foreclose its liens, but it does not comprehend a situation such as is presented in the present controversy. It is also true that the case of Twin Falls Oakley Land & Water Co. v. Martens et al. (No. 3478) 271 Fed. 428, recently decided by this court, was one for the foreclosure of like liens. The question here presented was not there suggested, but an expression of the court in the opinion rendered indicates by clear enunciation one difficulty attending the litigation. Referring to unpatented lands included in the scheme, the court says:

"Many entrymen upon those lands have improved them, and, at least until after full opportunity is afforded such entrymen for hearing, we are not ready to say that, where they have complied with the law, they are to be put in a position where all the water must go to patented lands, and that their lands may be rendered useless and their claim of vested rights ignored."

[3] It is settled that the lien of the construction company can only extend to the acreage for which it furnishes an adequate quantity of water. Twin Falls Salmon River Land & Water Co. v. Davis et al. (C. C. A.) 267 Fed. 382. Considering the confusion and complexity of the situation and the interdependent relations of the shareholders, and the difficulty of rendering the fair and exact justice that equity and good conscience rightfully demand, we are of the opinion that the learned trial judge properly directed that all shareholders be made parties to the proceeding. The requirement not having been complied with, there was no error in dismissing the bill.

Affirmed.